UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION


**UNITED STATES OF AMERICA,**    )
                           )
        Plaintiff,        )
                           )
                           )   **Case No. 3:16cr54/MCR**
                           )
vs.                     )   Pensacola, Florida
                           )   **March 23, 2018**
                           )   3:05 p.m.
                           )
**NICHOLAS G. PEACOCK,**       )
                           )
        Defendant.       )
_____)


TRANSCRIPT OF **SENTENCING** PROCEEDINGS
BEFORE THE HONORABLE M. CASEY RODGERS
CHIEF UNITED STATES DISTRICT JUDGE
(Pages 1-72)


### APPEARANCES

**FOR THE GOVERNMENT:**     **DAVID L. GOLDBERG, ESQUIRE**
                          United States Attorney's Office
                          21 East Garden Street, Suite 400
                          Pensacola, Florida  32502


**FOR THE DEFENDANT:**       **In propria persona**

(Stand-by counsel)       **RANDALL LOCKHART, ESQUIRE**
                          Office of the Federal Public Defender
                          3 West Garden Street, Suite 200
                          Pensacola, Florida  32502

*P R O C E E D I N G S*

1

2          *(Court called to order; Defendant present with stand-by*

3    *counsel.)*

4          **THE COURT:**  Good afternoon.  This afternoon we're

5    scheduled for sentencing hearing in the case of United States

6    versus Nicholas Peacock.  Mr. Peacock is here present in the

7    courtroom.

8          Mr. Peacock was permitted, back in July of 2017 --

9    well, actually in July of 2017 he was found competent to

10   proceed and entered a guilty plea at that time to both counts.

11   He subsequently was permitted to proceed representing himself.

12   There was a waiver of his Sixth Amendment right to counsel

13   taken by the magistrate judge, and he appears here today

14   representing himself.

15         Of course, the Federal Defender's Office was appointed

16   as stand-by.  Mr. Lockhart is here and present at counsel table

17   as well; from the Government, we have Mr. Goldberg present and

18   Agent Canning; and from Probation, Officer Newsome is present.

19         Mr. Peacock, the way that I typically proceed in a

20   sentencing is I will state on the record what the Guidelines

21   calculation is from your Presentence Report.  And then I'm

22   going to ask you if you've reviewed the Presentence Report.  I

23   believe you have because I've read a number of responses that

24   you've had to it, but I'll allow you to address the Court

25   regarding objections, and then I'll hear from the Government

1    regarding the Presentence Report, and then I'll hear from both

2    sides regarding sentencing in the case and ultimately the

3    factors that I have to take into account under 18 U.S.C.

4    3553(a) when I impose any sentence.

5         The guideline calculation from the Presentence Report,

6    2G1.3, starts at a base offense level of 28.  There were a

7    number of adjustments that took the offense level to an

8    adjusted level of 34.  There was 2 levels for use of a

9    computer, 2 levels for the commission of a sex act, 2 levels

10   for obstruction of justice.

11        And then beyond the adjusted offense level, there was

12   a Chapter 4 enhancement for pattern of activity under

13   4B1.5(b)(1).  The total offense level is a 39.  Mr. Peacock's

14   Criminal History Category is II.  The advisory recommended

15   guideline range is 292 to 365 months.

16        As I mentioned just a moment ago, there are two counts

17   in this case that Mr. Peacock has pled guilty to.  Count One is

18   enticement of a minor to engage in sexual activity, and Count

19   Two is traveling for illicit sexual activity with a person

20   under the age of 16.

21        Count One carries a mandatory minimum of 120 months or

22   ten years to life.  Count Two is a maximum of 30 years.

23        Mr. Peacock, as I said, I've received and reviewed a

24   number of submissions from you following your receipt of the

25   Presentence Report, the drafts of the report.  From what I can

1    tell, reading your submissions, I don't see an objection to the

2    calculation of the guideline range. I certainly read and

3    understand that you have an objection to the Guidelines

4    themselves and to the Guidelines as a whole, and you believe

5    they are too high in this case, but I don't see an objection to

6    the calculation.

7          However, Mr. Lockhart filed something, as stand-by

8    counsel, in response to the PSR, and in that filing

9    Mr. Lockhart did raise an objection to the application of the

10   pattern of activity at 4B1.5. And I need to ask you now if you

11   wish to proceed on that objection?

12         **THE DEFENDANT:** Yes, Your Honor.

13         **THE COURT:** Do you wish for Mr. Lockhart to make that

14   argument on your behalf or do you want to make it?

15         **THE DEFENDANT:** I would like to make just one argument

16   to that.

17         **THE COURT:** To the 4B1.5?

18         **THE DEFENDANT:** Yes. It's depending on child

19   pornography sentencing factors or elements that weren't tried

20   at trial. I wasn't even aware at the plea hearing that that

21   was part of it. I was having a lot of -- I was having a tough

22   time mentally back then, and I don't remember but only so much

23   of it. But I did look through it, and it was in the factual

24   plea basis -- or factual, you know, basis for guilt. But

25   there's a few things that I was wanting to challenge on that.

1      Number one, it says --

2      **THE COURT:**  I'm sorry, I apologize for interrupting

3   you, but I can't hear you very well, if you'll move that

4   microphone closer to you.  Thank you.

5      **THE DEFENDANT:**  Well, basically it says it's illegal

6   to ask or obtain any pictures from someone under the age of 18

7   if it's, you know, if it's inappropriate pictures.  But there

8   is one -- in the U.S. statutes for child pornography it

9   actually allows an exception for the pornography industries if

10  they didn't reasonably believe the person to be -- if they

11  reasonably believed them to be 18 or older.

12      In this case, I met F.S. in October through -- the end

13  of October through November.  I remember she told me she was

14  17, she'll be 18 in a few weeks.  She's also told another guy

15  she was 16, to be 17 in a few months, and another guy she told

16  she was 23.

17      I had no clue until the end of December, and the Skype

18  chat log shows that, of her age.  And everything that happened

19  -- those few pictures and that video that was allegedly sent

20  happened in the beginning of December.

21      There is a Supreme Court case that says that any

22  benefit in a protected class that's not given -- that's had the

23  exclusion of another class either has to be extended or cut out

24  altogether.  For an industry that's a pornography industry that

25  they're not even doing that except to sell this kind of stuff

1    to other people, it's not very -- not too much honor in that,

2    for them to have that kind of benefit but yet someone who is

3    not intending to do anything wrong not to have that benefit

4    doesn't tend to make sense.  And I believe it's a right that

5    needs to be extended to other people who didn't reasonably

6    believe them to be under that age.

7         **THE COURT:**  That would be a defense to the charge, and

8    you've pled guilty to the charge.

9         **THE DEFENDANT:**  Oh, it's a -- I wasn't -- I don't

10   believe it was a charge or just a fact or a part of the factual

11   basis, but I wasn't actually charged with it.

12        **THE COURT:**  But that part of your -- well, if it's

13   part of the factual basis, then it forms the basis of your plea

14   of guilty to the charge, and we're past that point.

15        **THE DEFENDANT:**  Oh.  Well, I didn't know when I was

16   taking a plea.  I'm sorry.

17        **THE COURT:**  Yeah.  I'll allow Mr. Goldberg to respond,

18   if he wishes to.  I'll consider it as part of your sentencing

19   position in the case, but it's not going to result in the

20   dismissal of any charges.

21        Mr. Goldberg?

22        **MR. GOLDBERG:**  I believe there are two flaws to that

23   argument by the Defense.  Number one, she still provided an age

24   which is of a minor.

25        **THE COURT:**  She what?  I'm sorry.

**MR. GOLDBERG:** She provided him an age that was still a minor, she clarified that. And number two, production of child pornography, it's my recollection of binding case law, is a strict liability defense. Mistake of age is not a defense even to the charge.

**THE COURT:** To the production?

**MR. GOLDBERG:** Yes. And his enhancement is based on him asking for more child pornography. In PSR paragraph 32, "Make another video for me. I want to see you cum." He's requesting more production of child pornography.

And I certainly defer to your law clerk in your chambers because I didn't know this was going to be an objection, but mistake of age I don't believe is a defense to the production of child pornography.

**THE COURT:** I can't imagine that it is, but I wasn't expecting this either.

**MR. GOLDBERG:** I'm most confident it is not. But regardless, we're at the sentencing phase, and this is about a pattern of activity, not the age of the victim. And in that PSR paragraph, which was not objected to, PSR paragraph 32, he's asking for another video of a minor female to be produced. "Another," of course, presupposes there's more before that. And asking her to cum, I will respectfully suggest, regards sexual activity.

**THE COURT:** I certainly can make that finding.

1    You just referenced, Mr. Goldberg, chats that

2    referenced the minor victim's age.  I don't know that those are

3    specifically in the Presentence Report.  Or are they?

4        **MR. GOLDBERG:**  I don't know that they are, Your Honor.

5    There were thousands of chats, but there was a reference to her

6    age --

7        **THE COURT:**  What were you referring to just now?

8        **MR. GOLDBERG:**  My recollection of the chats, and the

9    age she gave was never 18 or over.

10       **THE DEFENDANT:**  It was in the Skype chat logs.  One

11   was 16 and she said she'd be 17 in a few months, and the other

12   one was 23 and that was in April.  That was on the Toshiba

13   laptop.  She told me she was 17 in October and that she'd be 18

14   in a few weeks.  So, by the time we actually started dating, I

15   actually reasonably believed her to be 18, and that's in

16   December, that's when those pictures and videos were allegedly

17   shared.

18       The other thing I wanted to say was it doesn't say --

19   and I don't -- haven't shown specifically or exactly what was

20   sent to my device.  They've never taken anything off my

21   devices.  I mean, it could have been a video of a legitimate --

22   you know, off a legitimate pornography site.

23       I know -- I can't really remember what happened.  I

24   just remember she told me her age when I first met her, that's

25   it, and I met her in October or November -- or I believe it was

1  October now but --

2      **THE COURT:**  What Mr. Goldberg was just referring to,

3  Mr. Peacock, in paragraph 32 was your request or your

4  solicitation for a video of child pornography.

5      **THE DEFENDANT:**  Well, I mean, I don't know what video

6  specifically was sent.  They said -- the FBI said no child

7  pornography was located on my devices.

8      **THE COURT:**  That's not the point.  The point is that

9  you made the request.  That's enough to attempt to produce

10  child pornography.

11      **THE DEFENDANT:**  Even if you don't know their age or

12  didn't think --

13      **THE COURT:**  Well, I'm not making a finding that you

14  didn't know her age.  I mean, you said just a minute ago that

15  in one of the chats she said she was 16.

16      **THE DEFENDANT:**  That was a few months later that she

17  told somebody that she was 16 and be 17 in a few months, and

18  another person she told a month after that that she'd be 23.

19  That's in the Skype -- or that's in the Toshiba Skype chats.

20      **MR. GOLDBERG:**  Your Honor, if I may now enter

21  Government Exhibits D through F.  I showed them to Defense.  He

22  admitted he knew she was a minor, and he knew that, and now

23  he's trying to backtrack because he pled to it under oath at

24  the plea colloquy.  But let's just make a full record of it.

25      **THE COURT:**  Thank you.

1    **MR. GOLDBERG:**  Government's Exhibit D, that's the

2    victim.   She's 12.

3         Government's Exhibit E, that's the victim.   She's 12.

4    She's holding a chickadee.

5         Government's Exhibit F, that's the victim with like I

6    think a teddy bear on her head.   She's 12.

7         Even if the Defendant for some reason is suggesting

8    that he believed her to be 16, still a crime.   But he pled

9    under oath to her being a minor and him knowing it and that's

10   why he traveled to have sex with her.   So, to back out that

11   now, he would essentially be conceding that he committed

12   perjury that he's guilty.

13        **THE COURT:**   And, Mr. Goldberg, as you correctly

14   pointed out, the case law in the Eleventh Circuit is that

15   knowledge of the victim's age is not an element of the offense

16   on a charge for production of child pornography.

17        So that objection -- and this is the case of the

18   United States -- that I was just referring to is the case of

19   the *United States versus Curtis*, and that's at 513 Fed.Appx.

20   823.

21        **THE DEFENDANT:**   Could I say one thing?

22        **THE COURT:**   Yes.

23        **THE DEFENDANT:**   I do remember -- I don't remember for

24   the first two months that I met her what pictures were

25   exchanged.   My memory -- my best recollection starts from the

middle to the end of December.  But I do remember she did send

some pictures where she did look older, but I can't fully

recall in my state of mind of whether she was actually that old

or not.  It was hard for me to tell, from what I can remember.

I've been having difficulty with my memory.  That's

why I've been asking for discovery and needed those facts

because it's actually helped -- going through the chats has

helped me remember some things and it's been extremely

difficult.  I wouldn't say that if weren't true, you know.

And, you know, I wasn't trying to do anything wrong in this

case so --

**THE COURT:**  Well, you've pled guilty to both counts,

Mr. Peacock.  And when we get to sentencing, that's our

starting point is your plea of guilty or a finding of guilty by

the jury.  So, to the extent this is an objection to the

application of 4B1.5, it's overruled.

If you'd like Mr. Lockhart to present the other

objection on the application of 4B1.5, I would permit him to do

that now, if you would like him to.

**THE DEFENDANT:**  Sure.  I just wanted to put on the

record that there was no specific evidence showing what exactly

was sent, and there was nothing recovered from my phone.

That's all I wanted to put on the record.

**THE COURT:**  Okay.  Thank you.

Mr. Lockhart?

**MR. LOCKHART:** Judge, our objection is a legal one in terms of the pattern and practice application, which is to say that it's our position that the pattern of activity does not include multiple instances of sexual conduct with a single victim. And in large part we're relying on a contrast of the use of the language, the specific language that the Sentencing Commission put forward in 4B1.5 versus 2G2.2(b)(5), specifically comment 1, where they reference that 2G2.2(b)(5) in comment 1 relates to a pattern and practice such that it's spelled out in that note 1 that the pattern and practice can apply in situations involving the same minor, but that very specific language is not present in Chapter 4 at 4B1.5.

And so, essentially what I'm saying is that, as a result of the fact that it was written by the Sentencing Commission in both guidelines, so we're talking shared authorship as well as just traditional canons of construction, the presumption in general in statutory construction cases that Congress acts intentionally and purposefully with regard to the particular language that it uses and that silence in relationship to that 4B1.5 guideline, whether in the commentary or otherwise, is important.

And we make a separate argument, too, that's articulated fully in the response that applying the pattern and practice adjustment in circumstances where you have the same minor creates all kinds of disparity and just in general

1    doesn't make sense.

2            But that's, in essence, what the objection is, Judge,

3    so it's essentially a legal argument focusing on the specific

4    language between the two guideline provisions, but at the same

5    time, too, we recognize that there are other circuits -- I

6    think there's three at present --

7            **THE COURT:**  Right.

8            **MR. LOCKHART:**  -- that hold otherwise.

9            **THE COURT:**  The Eighth, the Sixth, and the Third, and

10   those circuits do so based on the plain language of this

11   guideline and the fact that in 2003 Congress -- the application

12   note was amended to eliminate the requirement of at least two

13   minor victims in order for the enhancement to apply, and that's

14   what these courts have relied on.

15           And I'm going to follow that reasoning and that

16   interpretation.  The fact that Congress had that language

17   removed strongly suggests the intent that it apply to multiple

18   instances with a single minor.

19           **MR. LOCKHART:**  And I certainly understand that, Judge,

20   and I've explained that that was likely going to be the Court's

21   ruling in relationship to my discussions with Mr. Peacock.

22           I guess, not to jump ahead, and I'm certainly going to

23   defer to him as to sentencing, but I think to an extent that

24   4G1.5 essentially applies a pattern and practice adjustment to

25   individuals in circumstances like this where we have a very

1    small number of images exchanged -- now, I recognize, too, that

2    there's a guilty plea such that that lays out actual sexual

3    contact, so that would be one instance, obviously.

4            But where we have -- I still would submit that Mr.

5    Peacock's case falls closer to the lower level of what the

6    Court likely has seen and will see in relationship to cases

7    where people are receiving and having produced a lot of child

8    pornography so that we have multiple, multiple images being

9    exchanged or even situations where there's been multiple sexual

10   contact between a minor and an adult.  And so --

11           **THE COURT:**  But this is production.

12           **MR. LOCKHART:**  It is, it is.  But what I'm saying is

13   that, in terms of the pattern and practice area, I would like

14   the Court certainly -- and it's open for Mr. Peacock to talk

15   about this -- to consider the severity of that 5-point

16   adjustment that kicks in when you have, for example, a client

17   who is engaged in a sex act but then during the same

18   discussions close in time with a minor there is a photograph

19   that's exchanged, that's going to result in a plus-5 increase

20   of the offense level.

21           But where you have other individuals that have sent

22   many more photos back and forth even in where you have repeated

23   sexual activity, those individuals are still, too, always

24   subjected to that plus-5 adjustment.

25           So, in some ways our argument is that, separate from

1   the legal argument of the language that's being used, which you

2   can compare between those two guideline provisions that I cite,

3   it's important because in some ways that plus-5 adjustment is a

4   race to the bottom.

5          If you have two instances, then you're getting that

6   plus-5 adjustment, but the guidelines and the Commission do

7   nothing to address any subsequent bumps or adjustments for

8   individuals that have done more serious acts, meaning more

9   instances of occurrence.  And two is minimal.  We see many more

10  than that, certainly.

11         And so, in some ways it operates similar to the child

12  pornography guideline, in that, it's going to apply in a lot of

13  cases but doesn't necessarily aid the Court in sifting out the

14  severity amongst different offenders because of course it

15  applies with two different instances or more.

16         And so, of course, just like the Court can vary upward

17  if it found that a plus-5 adjustment in a more serious case

18  wasn't enough, the Court certainly can consider whether the

19  guideline range is excessive under the circumstances that we

20  have here with Mr. Peacock.

21         **THE COURT:**  As far as a variance is what you're

22  referring to?

23         **MR. LOCKHART:**  Exactly.

24         **THE COURT:**  My understanding is that there -- and Mr.

25  Goldberg, correct me if I'm wrong -- but there was at least one

1    video, there were three to five images -- Mr. Goldberg can

2    correct me, again, if I'm wrong -- and then there was also live

3    streaming.

4    **MR. LOCKHART:**  I believe that's correct.  Now, I would

5    defer to Mr. Peacock, but that's what I've heard the Government

6    say.  I have seen some of those, but that's what the Government

7    has expressed to me, which, when the hearing started here and

8    when I saw Mr. Peacock earlier this week, I expressed to him,

9    but I would defer to him on that.

10   **THE COURT:**  Right.  And I just want to note for the

11   record that -- I believe this was at the time of the plea

12   hearing, but if that's incorrect, Mr. Goldberg can correct me

13   for the record -- that I directed the Government to appear here

14   -- and it might have been after the plea hearing, I'm sorry I

15   can't remember -- but to appear here with the images to review

16   them with Mr. Peacock and his then counsel, I believe Mr.

17   Sheehan was counsel at that time.

18   And, Mr. Goldberg, it's my understanding that that was

19   done, or at least the Government appeared here as directed

20   ready to share that evidence with Mr. Peacock.

21   **MR. GOLDBERG:**  Yes, Your Honor.  There's multiple

22   things, if you'll give me a moment.

23   **THE COURT:**  All right.

24   **MR. GOLDBERG:**  It was on July 12th, 2017, because, of

25   course, I memorialized it in a letter to Mr. Sheehan, that,

1   after hearing Your Honor's order/request to the Government to
2   be here, which included Special Agent Canning, with all the
3   child pornographic material.  And I provided it all pursuant to
4   Title 18 U.S.C. § 3509(m).

5           And in my letter that Mr. Sheehan also has, "The
6   Defense, including the Defendant himself, reviewed the
7   electronic evidence in the instant matter including contraband
8   images of the victim.  It included meeting with the special
9   agent assigned to the case as well as the undersigned," who was
10  myself, "who even at the time walked through the illicit
11  communications with the Defense."  So the Defendant himself had
12  access to all of that.

13          The actual child pornography that was recovered in
14  this case -- it's one of the interesting things about the
15  platform the Defendant was using to victimize the girl.  It was
16  Skype.  So sometimes when images and videos were sent, those
17  can be captured, those can be retained forensically oftentimes,
18  but live streaming is not going to be.

19          Assuming Your Honor isn't on Skype on a daily basis
20  but maybe uses an iPhone, so an Apple has FaceTime, right?  So
21  you can communicate with someone live and that's not going to
22  be recorded unless someone is actually trying to record you.
23  That's what the streaming is like on Skype, it's not going to
24  be retained.  But images that are taken or videos that are
25  taken can hopefully be forensically recovered.

1    So, such that we see in, again, PSR paragraph 32 when

2    the Defendant is asking for more child pornography, it was a

3    conversation about the 12-year-old putting a hairbrush in her

4    vagina and him asking to watch her cum.  We have that image.  I

5    have it here today, and I've shown it to Defense counsel.  We

6    were able to find that.  But that's an image or a video that's

7    been exchanged rather than the streaming.

8    So I'm not sure that what we actually were able to

9    forensically recover adequately constitutes the overall nature

10   of the child pornography exchange.  But what I can say, as you

11   articulated, it in total would be less than a dozen images and

12   videos of child pornography that were recorded and then

13   forensically captured later.

14   **THE COURT:**  Okay.  Thank you.  And you need not

15   respond to the legal objection because I've made my ruling, so

16   just in the interest of time it won't be necessary.

17   **MR. GOLDBERG:**  Yes, Your Honor.  The Government's

18   position is it's contrary to law, the Defendant's objection.

19   **THE COURT:**  Yes, sir.  Mr. Goldberg, do you have any

20   evidence that you intend to present at this hearing?

21   **MR. GOLDBERG:**  I have a few documentary items to place

22   before the Court to admit as part of the record at the Court's

23   pleasure.

24   **THE COURT:**  I'll ask you to do that in just one

25   moment.  There is one minor typographical change to the

1    Presence Report that I need to place on the record.  In

2    paragraph 49 of the Presentence Report there's a reference that

3    you'll see -- the last sentence of paragraph 49 states that,

4    "As noted in the offense conduct section of this report, the

5    Defendant utilized a computer to communicate with the

6    Defendant" -- that should be "the victim."  And that will be

7    reflected in the Statement of Reasons.

8              Thank you, Mr. Newsome.

9              And then, Mr. Goldberg, is there anything the

10   Government has as far as an objection or comment to the

11   Presentence Report?

12             **MR. GOLDBERG:**  No, Your Honor.  And the exhibits that

13   I have, if I could just use those to incorporate into the

14   3553(a) factors.  I've already shown them to the Defense in

15   advance, but I'll wait to respond to the Defendant.

16             **THE DEFENDANT:**  I need to --

17             **THE COURT:**  Mr. Peacock?

18             **THE DEFENDANT:**  I forgot to make one more -- it's a

19   minor objection.  You may allow it or not, but it's the

20   computer objection.  There's case law that says that computers

21   are so widespread used now, it would be like charging somebody

22   with speeding and then giving them an extra fine if they had a

23   car involved in the speeding fine.

24             And on that case I would like to object to that

25   because of such a wide prevalent use of computers.  I don't see

1    how it distinguishes a crime any worse or any less than

2    somebody who would do such a thing in person or otherwise, you

3    know.  I don't -- that doesn't make sense to me, so I was going

4    to object against that.

5            **THE COURT:**  That is properly applied in this case, and

6    so that calculation is accurate.  The objection will be

7    overruled.

8            **THE DEFENDANT:**  Okay.

9            **THE COURT:**  Mr. Peacock, did you have something else?

10           **THE DEFENDANT:**  Oh, no, no.  I'm sorry.

11           **THE COURT:**  The next sort of phase of the sentencing,

12   Mr. Peacock, would be for the Defense, yourself, as well as the

13   Government to present your position on the ultimate sentence in

14   the case, understanding that I have to apply a variety of

15   factors that are outlined in 18 U.S.C. 3553(a).

16           And if you would like to present your position in

17   regards to the ultimate sentence in this case, I'll hear from

18   you now.  And this can also include your allocution to the

19   Court as well.

20           **THE DEFENDANT:**  Okay.  There was one thing I forgot to

21   add.  I had a lot of things that I needed to send to the Court,

22   but they rejected my package, so I didn't get this until

23   yesterday.  I sent one before that, but it had been rejected.

24   They didn't even cancel it; they held it for a few days.  And I

25   didn't know what to do with it, so I thought I would ask that

1    and bring it to your attention that I meant to send it earlier

2    but I've been really depressed, and I know some things I kind

3    of got done at the last minute, and so I was putting everything

4    together about the truth of the case and just everything in

5    general.

6              It's a lot of work that I've done in this.  I mean,

7    it's quite extensive.  It covers my own diary I've wrote in

8    here and other things about at the time last year when I was

9    going through a lot of difficulties.  And I believe it's

10   relevant to this case about the actual facts of this case and

11   what really happened.  And it's the best I can do right now.  I

12   didn't know what to do because they rejected it, so I need to

13   give this to the Court.

14             **THE COURT:**  I'm not sure where it was rejected.

15   You're saying at the clerk's office?

16             **THE DEFENDANT:**  I've had so much difficulty at the

17   jail.  I've had several of my letters rejected.  I've not -- in

18   the five or six months I've been *pro se*, I've had two

19   paragraphs of law that I was able to ascertain, and it's been a

20   struggle since like March of last year trying to get help with

21   the law and trying to get help with, you know, just anything in

22   general to get done.

23             **THE COURT:**  Well, Mr. Peacock, you waived your right

24   to counsel in this case.

25             **THE DEFENDANT:**  Oh, yeah, I need to be *pro se* because

1    I had to get access to the law.  And I've been -- I haven't

2    gone anywhere.  I've not had adequate access to the law or any

3    facilities to research this case.  Every bit of case law I've

4    got is from every facility I've went everybody I've talked to

5    that had case law I've studied it.  This is all the case law

6    I've got, and it's months of work.

7         I read books on law.  I read anything I could get my

8    hands on just so I could learn.  I've read books on psychology,

9    psychiatry, sociobiology, like, you know, social programs,

10   welfare.  I've read books on sex offense, on basically the

11   causes of all these things, you know, psychology like reactive

12   effective disorder, which is probably what a lot of people have

13   if they have, you know, some kind of predilection towards

14   somebody that's younger, it's usually caused by trauma, that

15   makes them focused on a certain part in their life to recreate

16   that period of trauma to try to work through it.

17        **THE COURT:**  Well, and if that's the case with you,

18   then I'll certainly hear from you about that, if you feel that

19   that's what you're suffering from, in your allocution as part

20   of this sentencing hearing.

21        **THE DEFENDANT:**  Oh, yeah, yeah.

22        **THE COURT:**  Leonard, would you get that packet from

23   Mr. Peacock.

24        **THE DEFENDANT:**  This is everything.  This is all my

25   filings, everything.  It's got -- I know it's a lot.  I'm

1  sorry.  I just --

2        **THE COURT:**  Well, I'm certainly not going to be able

3  to read all of this before your sentencing, Mr. Peacock.

4        **THE DEFENDANT:**  I understand.

5        **THE COURT:**  But I'll look at it enough or glance

6  through it here in order to be able to determine if I find that

7  any of it is actually relevant to your sentencing.

8        **THE DEFENDANT:**  There's a part in there, my personal

9  diary, last year I was having considerable difficulty, and I

10  was writing a diary every -- about every week or so or every

11  few days I'd write an entry, and that part was really hard for

12  me to do because I've never done that before, and so it was

13  also -- every bit I could remember of when I met F.S. and

14  everything that happened is -- a lot of it is in that diary and

15  also the facts of the case are in there, and also as the case

16  progressed, you know, the difficulties that I was having the

17  last two times I was in court -- actually, the last three

18  times.  And it's stuff that's really hard to, you know, to

19  really admit or say, but I put that in there.

20        The psychiatrist -- you did tell me at the last

21  hearing that I would get -- the only psychiatrist would be the

22  one at the jail, but he did tell me the last time I saw him

23  that -- he said I was doing a good job of reassociating, and so

24  I figured, you know, that kind of verified what I thought,

25  because the only thing that I can think that makes sense in my

1   case is -- because the diary papers will show it -- is

2   potential delusional disorder with dissociative identity.  And

3   that's my best guess.  But, you know, I've tried to explain it

4   the best I could in there.

5         The two psychologists -- this is the other thing I was

6   going to say -- Betsy Campbell, she, in her actual clinical

7   testing -- because at the last hearing you said that the

8   clinical testing didn't reflect any problems at all, but her

9   actual clinical testing showed loss of contact with reality,

10   active psychotic OCD process, and there was something else I

11   can't quite remember, but that was part of what she said, but

12   it was only in one paragraph.  The rest of the ten pages were

13   kind of like covering that up, so it's got the truth of those

14   two meanings in there, too.

15         **THE COURT:**  I believe she concluded that you were

16   competent and that you had been manipulating and malingering.

17         **THE DEFENDANT:**  Well, I wrote about those two meanings

18   with the psychologist, and I've put all the details in the -- I

19   believe it's file 24 in there.  It's a pretty thick file.  It

20   has what happened, from the best I could remember.

21         I did have my paperwork thrown out three times but,

22   you know, the best I can remember and from what I could recall

23   I recreated what happened in those meetings with not only

24   Dr. Spoerl but Dr. Campbell, and it was in no way, shape, or

25   form the way she said it went in that room.

1    We butted heads for two-and-a-half hours, and I was

2 the only person in that facility that took two-and-a-half hours

3 to complete that evaluation period.  Everyone else I asked them

4 how long theirs took and it was 10, 15 minutes.  At one point

5 she was trying to give me the answers to the test and I just

6 stopped responding.

7    Something didn't feel right and -- I don't remember

8 much but I just remember it didn't go that well, and I wasn't

9 looking at her.  I was looking straight at the ground, and I

10 was scared and nervous the whole time, so but, you know, I

11 tried to open up to her, but she said -- in the beginning she

12 said, *Don't try to come in here and act like you're crazy, you*

13 *know, like people do that all the time to try to get one over*.

14 And I said, *I'm not trying to pretend.*  I said, *I'm just trying*

15 *to open up a little bit to you to see how you react because I*

16 *don't trust you.*  And she kind of said that, so I stopped

17 trusting her.

18    **THE COURT:**  So, Mr. Peacock, let me stop for a moment.

19 The packet that I'm looking at here, which is hundreds of

20 pages, double-sided in many cases and handwritten in very small

21 print, this was returned to you by the jail for security

22 reasons.  This was not -- I mean, as far as I can tell, this

23 was not returned to you by the clerk of court.  We would not

24 return something to a litigant for security reasons.

25    **THE DEFENDANT:**  They said the post office rejected it.

1   But if they didn't mail it, there wouldn't be markings on it

2   for the post office, unless it was a three-digit code, because

3   I used to work for them, but I don't see any code on there.  I

4   think the jail just held the package for a few days and then

5   gave it back to me and said --

6          **THE COURT:**  Yeah, it says, "Attention:  Mailing

7   Customer."  So I'm not sure where it got held up, but I do not

8   believe it got held up at the court.  But essentially what

9   I'm --

10         **THE DEFENDANT:**  Oh, no, it wasn't by the court, no, it

11  wasn't -- y'all didn't hold it up.  It was the jail.  I've been

12  having trouble with them and that's what I --

13         **THE COURT:**  So what I'm seeing in this packet of

14  documents is much of what has already been presented to the

15  Court, and so it's a repeat or a rehash of -- for instance,

16  your request to withdraw your guilty plea, which has been

17  considered and denied several times.  There's a couple of --

18  two or three different motions to dismiss, which would

19  certainly be untimely at this point.  There's a complaint about

20  discovery, which I have addressed and, again, would be untimely

21  at this point.

22         There appears -- and this may be a part of what you're

23  characterizing as your diary, but it appears that you are

24  wanting to say to me that you were trying to rescue F.S.  And

25  that's not a defense.  You don't rescue a 12-year-old by taking

1    her across state lines and having sex with her.

2           **THE DEFENDANT:**  Well --

3           **THE COURT:**  So, to the extent that's what you want me

4    to understand, certainly I will hear from you, you can tell me

5    that here in open court.  I do not have time to read all of

6    these pages, I just do not.

7           **THE DEFENDANT:**  Is there any way to just get it to the

8    clerk of court?  Because I've been trying to get that on the

9    record and I've been behind the --

10          **THE COURT:**  Mr. -- I don't know why these were

11   returned but, Mr. Peacock, I'm not going to go through and read

12   all of this, and so there's no point in you filing it if I'm

13   not going to read it.  And also, much of this is entitled

14   "Notice to the Court."  Well, the Court responds to a request

15   for relief for some type of action by the Court.

16          Now, a few of these would be considered, like I said,

17   motions.  There's a motion to dismiss, motion to withdraw your

18   guilty plea, and it may be that we accept those, and I'll give

19   you the same ruling that I have in the past.  To the extent you

20   want to place that on the record again, I guess there's no harm

21   in that.  I wouldn't require the Government to take the time to

22   respond.

23          But all of these pages that are entitled "Complaint

24   and Affidavit," and there's just dozens and dozens of pages

25   that are referred to as "Complaint and Affidavit," they will

1    not be accepted.  Anything that's "Notice to the Court" is not

2    going to be accepted.

3         But I will hear from you today.  That's what we're

4    here for, and I will hear from you today.  And if you'd like to

5    have some of this back so you can refer to it in making your

6    allocution to the Court, then I'll be happy to allow you to

7    have this back and -- because it certainly does look like

8    you've done a lot of work here.

9         Would you like these back for --

10        **THE DEFENDANT:**  If it won't be admitted on the record,

11   then I'd like it back.  I wanted to turn it in just so it'd be

12   on the record because I just wanted the truth of the case to be

13   known.  I didn't know how else to make it known, so I spent a

14   time, of course, writing a lot, as you can tell.  But basically

15   I --

16        **THE COURT:**  Well, part time of the problem with this,

17   Mr. Peacock, is I don't have time to read all of this.  And I

18   don't know how much of it pertains to the charges in the case

19   and your sort of perception of a defense to the charges versus

20   potential mitigation of sentence.

21        So I'll ask Ms. Jacobs to assist me and to try to

22   separate out anything that is entitled "Motion" from what's

23   entitled "Complaint and Affidavit" and "Notice to the Court,"

24   and those I will return to you.

25        Or, Mr. Lockhart, you can do it, if you would rather

1    you do it than --

2    **MR. LOCKHART:**  Well, I certainly have no problem doing

3    that, Judge.  Will the Court allow us to do that at the

4    conclusion of this hearing?

5    **THE COURT:**  Yes.  So I'll give it back now, so if

6    there's something that Mr. Peacock wants to refer to, he can do

7    that.  And then, yes, if you would please assist with that, I

8    would appreciate it.

9    **THE DEFENDANT:**  Okay.  Thank you for addressing that.

10   I didn't -- I just wanted it at least to be addressed

11   because --

12   **MR. GOLDBERG:**  Your Honor, just let the record reflect

13   the sentencing has been pending for eight months now.  He pled

14   guilty in July of 2017, so there was plenty of time to get it

15   filed, and we know he successfully filed almost half a dozen

16   objections to the PSR.

17   **THE COURT:**  With case law citations as well.

18   **THE DEFENDANT:**  I was severely depressed, that's why.

19   I just got to the point where I got so tired of writing and

20   just -- you know, that's why I stopped the diary in October.

21   But, you know, it just -- so many things have happened

22   in this case, and it's almost like what's the point, you know.

23   I just -- I needed my discovery.  I was having memory problems,

24   I still do.  Every day I wake up I'm confused, and I don't know

25   if what I did -- was it right or was it wrong, you know.

1          **THE COURT:**  It was wrong.

2          **THE DEFENDANT:**  That's what a lot of people told me,

3   see.

4          **THE COURT:**  There's no question about that.

5          **THE DEFENDANT:**  But, you know, I guess I should just

6   have a chance to explain everything.  So I pretty much met her

7   in -- I thought it was November, but I found out it was October

8   by the chat logs because it goes back that far, and my memory

9   started getting jogged as time went on to where I could start

10  to remember a few things and have flashbacks, which actually

11  helped, you know, when you -- when the psychiatrist said I was

12  reassociating, well, I was like, that's good, I'm actually

13  getting my memories back.

14         So, anyway, I met her, I didn't know her age.  I found

15  out at the end of December.  We had been dating about two or

16  three months and then I found out her age.  She actually said

17  on the record -- well, Mr. Goldberg used this as well in one of

18  those letters to the Court, he said, "I thought he knew I was

19  13."

20         But, see, he left out the next part she said was that

21  she said, "He didn't know."  So he's using that as proof that I

22  knew her age, but she said, "I thought he knew I was 13 but he

23  didn't know."  And I remember that part, that's where my

24  memories -- you know, that's where they kind of begin actually

25  mostly.

1          And it wasn't just that, it was other guys that she

2     was talking to and doing things with, and I learned through

3     other people what was really going on at that time.  So I

4     remember I made a decision to kind of move on.  I realized she

5     was mentally fragile at that point, and I didn't want to do

6     anything to add to that or hurt her in any way or, you know --

7          **THE COURT:**  And at what point was that?

8          **THE DEFENDANT:**  That was the end of December.  I wish

9     I had the exact date.  I believe it was the 29th, but I know it

10    was near the end of December when we --

11         **MR. GOLDBERG:**  Actually, Your Honor, just so we're

12    clear because you had asked me, I found the report.  I actually

13    do have the chat when I referenced the age, which has been

14    turned over in discovery.

15         On December 26th, 2015, the victim says, "I thought

16    you knew I was 13.  I love too many people."  He responds, "he"

17    being the Defendant, "You don't have to be sneaky to get what

18    you want.  At first I didn't know you were 13."  It's after

19    that, later in the day, that she makes reference to being 15,

20    16, or 17, and she writes at 7:35 p.m., "Yeah, no, I'm 13."

21         That was in December of 2015 he travels to have sex

22    with her, which is rape, statutory rape, and that would have

23    been months thereafter, so he would have been advised well in

24    advance of the travel that she was underaged.  But, again, he

25    pled guilty to it.

1         **THE COURT:** So can I ask, was she 12 or was she 13?

2         **MR. GOLDBERG:** I'd have to look at her exact date of

3 birth on December of -- may I have the Court's indulgence?

4         **THE COURT:** Would you? Because I've seen a reference

5 to both. And not that it's terribly material, but I guess I

6 would like to have it accurate.

7         **THE DEFENDANT:** I believe it was July 1st, 2003. 7/1,

8 yeah, that's it.

9         **MR. GOLDBERG:** Yes, Your Honor, she was born XXXX XXX,

10 2003, so in December of 2015 she would have been 12. When he

11 traveled in April of 2016 she still would have been 12.

12         **THE COURT:** All right. Thank you for that

13 clarification.

14         Go ahead, Mr. Peacock.

15         **THE DEFENDANT:** Anyway, as I just said, I guess it was

16 December 26th it was around that age. I know it was near the

17 end of December. I thought it was mid to the end that -- the

18 chats I thought were at the end of December.

19         And so, I remember saying something about "I know you

20 needed someone to be there so I was here for support," et

21 cetera, et cetera. I got mad at her at one point because of

22 stuff I found out, and then I had made up my mind that I would

23 just -- I would, you know, move on, just talk to her a little

24 less and a little less and then she would probably -- you know,

25 we would just drift apart, you know.

1          I didn't want to just say *I'm not talking to you ever*
2     *again* because I thought that would be rude.  Besides, I had
3     already spent three months, you know, talking to her and that's
4     just not me.  I'm not that kind of a person.  I wouldn't just
5     be rude to somebody like that.
6          And it was -- I -- I believe we stopped talking about
7     a week, week-and-a-half, probably about a week, but I remember
8     that she came back and was the one that talked to me again and
9     saying she had attempted suicide.  And I've -- I remember she
10    talked about drowning herself in the tub, talking about she was
11    looking for a shotgun at one point and she was going to shoot
12    herself.  She actually confessed that several times.
13         So I felt compelled to talk to her because I didn't
14    know what to do because I've been like that since I was little,
15    you know, since I was six years old I've had -- I know exactly
16    what it feels like so I keep talking to her after that point.
17         And about a week later, around January 15th, I knew
18    something wasn't right, and I kept talking to her.  I told her
19    I was at work, I said, "Just wait, just hang on, wait until I
20    get off work," you know, "and just promise me you'll be here,"
21    she said, "I can't promise, to be honest."  I remember that
22    part.
23         And that was the day that one of my friends was
24    chatting with her on Skype and then -- it's hard for me to even
25    remember that part, but that's the day that she actually hung

1    herself when she was chatting with him and she -- in the middle
2    of a screen chat.  And I had the chats where he was talking to
3    her, and she went and tied a rope to the ceiling fan in the
4    middle of it, and he's freaking out, you can clearly see it in
5    the chats.  He's saying, "No, F.S., don't do this!  No!"  And
6    then she hangs herself.
7            And then he's completely freaking out and he's -- he
8    took a picture and he doesn't know why because he had talked to
9    me later and said -- he sent me a picture and he told me after
10   I got off of work that she hung herself and that a family
11   member found her supposedly right after she did it and got her
12   down, but that she was supposedly in the hospital or something.
13           And I remember that day because it was really painful.
14   And he sent the picture to me, and he said, "I don't know why I
15   took the picture, I just --"  I guess maybe he thought it was
16   the last time he'd see her, I don't really know.
17           And I had that picture on my phone, and that was part
18   of the discovery because I was wanting to show the Court that
19   because that's not something that's easy to go through when you
20   see somebody hanging like that and their face was blue and
21   purple.
22           It's not-- and the thing was, see, I had just -- we
23   had just split up, and at the end of December she asked me, she
24   said, "Do you want to get back together with me or not," or
25   something like that, and I said, "No.  Now is not the best

time." I said, "It's never a good idea to get back with someone just because you're afraid of losing them," and also because of the things she was going through.

And, you see, if I was trying to entice someone, I wouldn't have said that. I would have said -- I would have never -- I would have always been going for one thing and one thing only. So I always thought of her first. But when I saw a picture of her hanging two weeks later and found out what happened, I blamed myself because I honestly thought I wasn't there enough for her, so I put that on me and, um -- sorry, give me a second.

(Defendant crying.)

THE COURT: Leonard, please -- yes, thank you.

THE DEFENDANT: Thanks. Sorry. I haven't been able to deal with that ever since it happened. I still remember that picture because sometimes I have like a photographic memory, and I can still picture her face and everything, and I remember how dark it was in that picture, I remember the rope.

THE COURT: Okay. Well, she recovered, obviously.

THE DEFENDANT: Yeah, obviously, I mean, I was talking to her, but it terrorized me, it scared me so badly. I thought it was my fault, and I thought I wasn't there enough, it was my fault. And I start talking to her again afterwards, and I'm freaking out and I don't even know what I'm saying.

I remember the guy, Chris, who was talking to her

before when she did that, he talked to me for two hours on the phone, and I remember sitting in the parking lot and I don't remember a word he was saying. And I talked to F.S., and I was freaking out and that's in the Skype chats.

And then she asked after we started talking again, she said, "So answer me one thing," and I don't even have to look at the chat logs because I remember this, you know, I probably won't ever forget it, she said, "So am I yours or not?"

And how do you -- I didn't know how to say no. Like how do you know say no when someone just hung themselves and you think it's your fault? So I say yes. And I took a moment to think about it like before I answered, but I thought whatever it takes I'll just be there for that person. As long as they're okay, it's worth it, you know.

I kind of just sacrificed myself and, you know, so -- but I knew she was mentally fragile because all the stuff she told me about and all the suicide attempts, and I didn't want to do anything more to her like to add anything on her plate so -- and because of her age and other issues.

That's why, if you look, there's no -- I don't do anything. I don't ask for any pictures. I don't want to do anything wrong with her. Except there was only one time a few days later, but she initiated that. I didn't even want to do it. It was a few minutes of sexual chats. I think it was the 20th of January. And that didn't even feel right, so that was

1   the last time I did anything like that.

2          That's why there's a huge gap of three months that we

3   don't ever talk about, you know, anything sexual, except one

4   time she admitted something about the hairbrush, and I just --

5   I don't even -- that's not sexual to me.  That's just, you

6   know, seeing something dry inside the round circle part.

7          But that's not -- anyway, um, so I'm there, I spend

8   all this time with her talking to her.  I spend months, you

9   know, we talk on the phone.  And there's so many times when we

10  talk on the phone where I would talk and she would fall asleep.

11  And I would stay on the phone with her an hour or two later

12  because I would stay up a little later sometimes, and I'd just

13  put it on mute in case she had trouble sleeping, and I would

14  just let her know I was there and she'd go back to sleep.

15         And this whole time when I was going through that, the

16  girl that I had been with previously for a long time, the one I

17  talked about at the last hearing, she was being very abusive.

18  And I don't like to talk, you know, badly about someone, but

19  she had been horribly abusive to me all because I wouldn't be

20  with her because she was violent.  I didn't realize that until

21  years and years after I was with her and we finally split up.

22         She -- I really don't want to say this stuff, but I

23  don't feel like I have a choice.  I remember sleeping in the

24  bed and she would take the fold-up chair and hit me with it.

25  She threw a glass candle at me.  She tried to attack me with

1    that a knife.  And then I locked myself in a room and she

2    kicked halfway through the door.  And that video is on my phone

3    that the FBI has.

4          And Donald Sheehan asked if I wanted to take attempted

5    murder charges out and I said no.  She's good with the kids

6    that I have, so like, you know, I could never do that to

7    somebody.  She just doesn't like me apparently.  But this whole

8    time I'm talking to F.S. during this time, and it's nice to

9    have someone that I could actually connect with and have an

10   understanding with.

11         And so it wasn't like I was trying to take advantage

12   of somebody or exploit somebody.  I think we just developed,

13   through extreme circumstances, a relationship with each other.

14   And it wasn't like what, you know, the prosecution is trying to

15   make it to be.  It's not like that at all.  I wouldn't do

16   anything wrong or try to take advantage of somebody.  That's

17   not me.  So -- and then --

18         **THE COURT:**  Mr. Peacock, do you not think it's wrong

19   for a 32-year-old man to have sex with a 12-year-old girl?

20         **THE DEFENDANT:**  Well, I thought she was 13.  I know it

21   doesn't make much difference, but to be honest, I think it's

22   highly unusual, but I think ultimately it happens a lot.  And I

23   don't -- I don't think it's as bad as people make it out to be.

24         I'm not saying I did that, but I'm just saying, if it

25   happen, like it's not -- you know, it's going to happen.

1    People just take things the wrong way.  It's the intention.  If
2    you're trying to take advantage of somebody, you don't care
3    about them, you just one want thing, I can see it, that's not
4    right.  If you actually develop a relationship with someone to
5    where you're close to that person and you love to spend time
6    with them, you can see years down the road with them, that's a
7    little different to me.  So I don't see it as the same.

8         I mean, there's a lot of cases where people have
9    gotten, you know, in relationships and they're older and with
10   younger people and, you know, Jerry Lee Lewis is an example.
11   Elvis actually met Priscilla when she was 14 and he was 25, and
12   then he courted her for seven years until he married her, and
13   then they stayed together until he cheated on her, which he was
14   kind of dumb to do that, and then she broke up with him.

15        But, you know, there's countless examples of people
16   that have gotten in relationships that have spent the rest of
17   their lives together.  And in that sense, I don't think
18   something like that would be wrong.  I think it's the intention
19   that's wrong, if you have bad intentions.

20        If you're not honorable -- I thought the Bible's
21   example where if you do something like that -- Corinthians 7:36
22   says if you -- let's see, hold on a second, I'm trying to
23   remember -- it says, if a man thinks he acts himself uncomely
24   or, you know, takes, you know, like kind of hits on her or
25   comes on to his virgin, which I guess means like his maiden or

1    whatever, if she passes the flower of age, which is puberty,

2    then if need so requires, let them marry, he sins not.

3         And a lot of faiths around the world follow that, that

4    after the age of puberty that, you know -- because when I was

5    13 or 14 I wanted to have a family and I wanted to start work,

6    have a family, meet somebody, but I wasn't allowed to.  I had

7    to wait five more years, and it just wasted time.  I could have

8    passed the GED in no time at all and gone to college.

9         And that's also the deal with -- has to do with

10   people's upbringing.  In the *Psychology Today* journal, it

11   showed -- "Up From Chaos" is an article in last year's

12   magazine, and it said that when people go through chaotic

13   upbringings that they tend to employ fast strategies -- they

14   have kids earlier, they get started in life earlier, they don't

15   delay gratification.

16        But people who grew up in more safe and secure

17   environments, they're the ones that are more prone to going to

18   college, delaying gratification.  But each one -- for the ones

19   that grew up in a chaotic upbringing, it's more of a survival

20   strategy.

21        Also, biology shows that a woman's -- the best time

22   for her to have kids is between 15 and 25 to produce strong

23   genetics.  And anytime after that point increases the chance of

24   genetic problems, and it actually goes up very high.  Until a

25   woman hits her mid forties, there's a very high rate of genetic

problems.  And biology naturally inclines to have kids, you
know, earlier.

In fact, I believe that's one of the things that
America was based on for providing the manpower in the Civil
War and both world wars, and if it weren't for that I don't
think we'd get where we're at today.

**THE COURT:**  Mr. Peacock, you're getting a little off
track, and our time is limited.  We do have a time frame here,
so I'm going to ask you to wrap up, please.

**THE DEFENDANT:**  Okay.  Sorry.  But, no, my intention
for driving -- like what happened after I was talking to her a
few months later, she told me she was homeless, and I kept
trying to get her to get help.  She said she was freezing cold,
hadn't ate.  And I didn't know if she was being 100 percent,
you know, honest or not.  I thought I'd just wait and see if,
you know, the remedy corrects itself over time.

After a week, she still said the same thing was
happening, and I tried to get her to get help.  I tried to get
her to go to the police.  I tried to tell her if she could get
to a restaurant we'll use my card and pay for a meal.  And
about a day or so later she starts making spelling mistakes,
she starts slurring her words.  And when I called her,
something didn't feel right and something was wrong.

And the day that my ex attacked me with a knife was --
the next day was when I went to pick up F.S.  It was just so

much stress.  And like I said in the pleading, I honestly
thought she was going to die.  That was what I went down to get
her for.  And if that means I'm guilty of perjury, then, you
know, then, so be it, but that's the truth.  I didn't think I
had a choice.  It felt like I literally had no choice.

And my only goal was to make sure she was okay, and it
clearly says that in the entire Skype chat logs.  It backs up
everything I'm saying.  And that's what my papers here are
about that I was wanting to admit.

But, you know, I spent all this time with her, and
this is the strange thing:  I pick her up and make sure she's
eaten, and my boss texted me before I get there and says you
have to be at work the next day, and it was supposed to be my
day off.

My only goal was to talk her into getting help, that
was it.  And I thought I could do that better in person and
make sure she's okay.  But then I realized I had to go all the
way back to North Carolina, so she said okay, so I rushed back.

And those two days -- like I'm used to the last five
or six years of my life not being treated that well, obviously,
with the person I used to be with.  And those two days I spent
with her, she was actually really nice, and it was probably one
of the better times in my life.  She was really gentle to me.
She was, I mean -- and that's the one thing that's helped me
get through all this was the fact that someone actually cared

1  enough.

2         I remember I brought her dinner, and I was sitting on

3  the edge of the bed -- I had just drove 24 hours and worked a

4  10-, 12-hour shift.  I was exhausted.  And after we were done

5  eating, I was sitting on the bed, and she asked me if I wanted

6  a back rub.  And I don't turn that down for anything, because I

7  don't get them that often, and so I said sure.

8         And it was the fact that, you know, she thought of me

9  that much, and it was -- I wasn't used to that, just a little

10  thing like that.  And so it was just how nice she was, how

11  gentle she was and the way her hands felt.  I remember all the

12  little details like that.

13         And so, then I fell back on the bed.  I was exhausted.

14  I think within five minutes I was probably passed out, and

15  that's unusual because I have insomnia.  But I remember she put

16  her head on my chest and we stayed like that, we didn't budge

17  the whole night.  And I've never felt that close to somebody

18  before.

19         And so, with all the stress I was going under at the

20  time, I was so confused.  And I realized, you know, 30 years

21  I've tried to do what's right, and so I did the best I can, and

22  I've worked, I joined the Navy.  When the terrorists hit the

23  Twin Towers, you know, I joined to be a SEAL.  And I had some

24  health problems so I got a general discharge with the hormones.

25  My thyroids had some problems.

1    But, you know, I mean, I've stopped an armed robbery
2    in progress.  I've worked, I've kept two jobs over at the post
3    office, did everything to help others that I could, you know.
4    I raised two great kids.  And the whole time -- my whole life
5    I've not experienced any moment like that day I spent with her.
6    Just that one moment, that felt perfect.  It almost felt like
7    our souls were like -- we were each other's other half, and I
8    don't know how else to explain it.
9        And people look at it like they just want to hate you
10   for this kind of thing, and it's like I've really been
11   incredibly confused and I think it's taken all this time --
12   I've had five death threats so far, and it's been incredibly
13   difficult because of the stigma of this kind of thing in
14   general to have the courage to say, you know, to say what I'm
15   saying, that I think I fell in love with the person, you know,
16   I fell in love with her.  And it's hard to say that.
17       People are just going to want to hate you for that.
18   They just want to look at the whole situation and judge by an
19   age, and that seems to be the only defining judgment is your
20   age and that's it.  They don't look at the rest of any -- of
21   the case.
22       And so, I don't think I did anything wrong.  I don't
23   think I did anything horribly wrong.  And I'm not one to shy
24   away.  I said that I was hers, and I keep my word, and so --
25   unless she don't want me, of course but, you know --

1      And the reason I wrote the letters to her grandparents

2  were I finally got the discovery almost a year-and-a-half later

3  after I got arrested, but the last thing that she heard about

4  me was that that guy Chris told her that I hated her.  And

5  that's why I wrote those letters because I didn't want to her

6  think I hated her.  I thought that was horrible.

7      I mean, either her phone was taken away, my Skype was

8  locked.  I didn't know how to get in touch with her again.  And

9  if weren't for that, you know, I'd still talk to her every day

10 and want to spend time with her.  And if we weren't in a

11 relationship, I'd still want to be friends with her because we

12 had conversations that me and other people almost never have on

13 such a deep level.  But I just didn't want her to think I hated

14 her because I never did.

15      And a lot of other people in my situation, they'd say,

16 *Look what she's put you through.*  I've had so many people in

17 jail say, *Look what she's put you through.  Look at all that*

18 *you're gone through.*  And they want me to say -- *Don't you wish*

19 *you had never met her*, and this and that.  And I'm like, *No*,

20 because, you know, she actually helped me when I was going

21 through a dark time.

22      **THE COURT:**  All right.  I think I understand,

23 Mr. Peacock.  And I thank you for your allocution.  I need to

24 hear from the Government at this point.  Thank you.

25      Mr. Goldberg?

1      **MR. GOLDBERG:**  Yes, Your Honor.  Though I think the

2   Defendant probably just did a better job arguing for a severe

3   sentence than I can, the Government would point out a couple of

4   things during his allocution, for purposes of the record.

5          His lack of credibility is almost hard to calibrate.

6   He constantly complains about discovery, but then he just said

7   during his allocution he saw it in discovery, that you can see

8   it in the entire Skype chat logs.

9          **THE DEFENDANT:**  A year and a half later.

10         **MR. GOLDBERG:**  Discovery was provided to Mr. Sheehan

11  the day this Court issued the protective order.

12         I do also find it interesting that the Defendant is

13  constantly saying when it regards to sexual chats that "I don't

14  remember that.  I was depressed."  But, then, during his

15  allocution he just said he has a photographic memory.

16         But we don't have to just rely on his farcical

17  recitation, because when he went to the BOP Federal Medical

18  Center for weeks to be evaluated, those are evaluations that of

19  course this Court can rely on.

20         This is Document 40, page 5.  He scored at a high

21  average range for verbal comprehension, a very superior range

22  for perceptual reasoning, a very superior range for working

23  memory, a superior range on processing speed index, attained a

24  full scale IQ of 136, which is the very superior range, and a

25  general ability score of 128, which is superior range.

The problem for the Defendant, again at Document 40,
page 8, "Mr. Peacock has been diagnosed with unspecified
personality disorder with narcissism and paranoid traits.
Narcissistic features include a grandiose sense of
self-importance and entitlement, exaggeration about
accomplishments and achievements, interpersonally exploitive
behavior, and lack of empathy for others."

We're talking about a 12-year-old girl.  She was 12.
He knew she was a little girl.  He spent months grooming her,
that's what all this chat is.  And he cites biblical verse
about loving and marrying younger females.  But I surely,
though not an expert in the Old neither the New Testament, I
don't remember anywhere where it says, "I want to take a bath
with you and fuck you under water and above.  Could I hold you
under and make you go very long while I fuck you?"  That's in
paragraph 32.

Then he discusses the "I don't know anything about the
hairbrush."  He said that during his allocution.  Again, that's
paragraph 32, but he writes:  "Make another video for me.  I
want to see you cum.  I noticed you couldn't get the handle all
the way in.  Are you that tight?"

I'm going to move to admit, because I have to make a
record, Government's Exhibit G.  May I have the Court's
indulgence?

**THE COURT:**  Yes, sir.

1     **MR. GOLDBERG:**  We have the image.  The 12-year-old was

2 jamming a hairbrush into her vagina and he's asking how tight

3 she is.

4          Has a photographic memory but I bet you forgot that

5 one.

6          **THE DEFENDANT:**  It's -- it's -- it only remembers

7 certain things, but when it does, it doesn't forget.

8          **THE COURT:**  Mr. Peacock, Mr. Goldberg was quiet while

9 you --

10         **THE DEFENDANT:**  Oh, I'm sorry, I'm sorry.

11         **THE COURT:**  Thank you.

12         **THE DEFENDANT:**  I was just saying it's not -- it

13 doesn't remember everything.

14         **MR. GOLDBERG:**  These text communications went on for

15 months.  As Your Honor astutely points out, this Defendant is

16 very bright.  Some of his filings were better than some of even

17 the U.S. Attorney's and the Defense's are.  His case citations

18 are on point regarding sentencing.

19         And then he wrote and he says here again today, "I

20 don't feel like I did anything wrong."

21         I filed some more chat in Document No. 96 where he

22 writes, "I could be violent with you from so much force.  God I

23 want to fuck you."  This, again, is in Document 96.  He knows

24 exactly what he's doing, over and over again.

25         And if he didn't think what he was doing was wrong,

well, let's look at Government's Exhibit A, which is right
after the event when he traveled to have sex with her.  He
realizes he's caught, so he texts her:  "All they have so far
is circumstantial evidence.  I could be in jail for 7 to 10
years.  I don't get the big deal with sex."  That's fascinating
because during his allocution he said he just lied next to her
and it was cuddly and wonderful.  This is him, sex.

          "It's called statutory rape.  It's a major offense."
That's him texting.

          Didn't think he did anything wrong?

          "Turn your phone off and hide the SIM and delete my
info."  That's destruction of evidence.  That certainly would
suggest, at the very least circumstantially if not directly,
that he knew he was culpable of something illicit.

          Regarding his constant reference to his mental state,
let's look at Government's Exhibits B and C.  That is the route
he took, Government's Exhibit B, on April 1st and 2nd.  He
drove all the way from Salisbury, North Carolina, to Pensacola,
Florida, picked her up.  That's about seven-plus hours.  That's
a lot of traffic laws to obey -- speed limits, traffic signs,
following directions.  He's clearly competent.  Drives all the
way back with her, has sex with her.

          Government's Exhibit C.  April 4th, 5th, drives her
all the way back again to the Pensacola area, and then he
drives all the way back himself again.

1    You can't be incompetent and do that.  You can't say

2 you don't have an understanding of the world and manage to

3 drive all that way, and then the next day, as noted in

4 Government's Exhibit A, which is April 6th, 7th, 8th, next

5 three days, talk about the destruction of evidence.  That's

6 just not a credible argument.

7    I've already shown the Court Government's Exhibits D,

8 E, and F, the 12-year-old herself.  There's no mistaking this

9 is a minor, the one with the teddy bear.

10    **THE COURT:**  I saw it earlier.

11    **MR. GOLDBERG:**  So what we're left with is actually a

12 defendant who is truly a predator.  It took months.  He groomed

13 her over months.  People think that predators are just trolls

14 who live in basements.  This is a predator.  He preyed on her.

15 For months they communicated through Skype, text messages,

16 videos, requesting child pornography.  Seven-plus hours down,

17 seven-plus hours back, seven-plus hours down, seven-plus hours

18 back.

19    So you're sentencing an actual hands-on offender.

20 This is what we always worry about in these child exploitation

21 crimes.  This is a man who committed statutory rape, and he

22 traveled through multiple states to get to it.  And he says he

23 loves her.

24    I do want to make sure the Court has the Victim Impact

25 Statement from the grandmother of the victim, and I would like

1    that to be part of the record.  I believe it was submitted

2    through the United States Probation Office.

3             THE COURT:  I do.  Has the Defense seen it?

4             MR. GOLDBERG:  Yes, Your Honor.  I received it this

5    morning, and I immediately served it upon the Defense, so if we

6    could make that part of the record.

7             THE COURT:  Yes.  I don't know what exhibit --

8             MR. GOLDBERG:  I don't have an exhibit number, but I

9    could certainly make one.

10            THE COURT:  Well, the images that you've identified

11   were G and --

12            MR. GOLDBERG:  A through G, so I'll make this H.

13            THE COURT:  All of those will be admitted into the

14   record.

15   (Government's Exhibits A through H admitted into evidence.)

16            MR. GOLDBERG:  And Your Honor, I'll ask to have them

17   all sealed.

18            THE COURT:  Yes, they'll be sealed.

19            MR. GOLDBERG:  May I approach Madam Clerk?

20            THE COURT:  Yes.

21            MR. GOLDBERG:  And I should note for the record that

22   the victim's grandmother is present.  She wishes to rely on the

23   letter, and she does not wish to speak any further than that.

24            So I don't know, respectfully, how Your Honor could

25   even remotely deviate from the top of the guidelines or above.

1    Obviously we need specific deterrence because he's talking

2    about wanting to be with her and marry her, so he needs to be

3    incapacitated.  Clearly we need general deterrence so the rest

4    of society knows that if you do this to a little girl you are

5    going to be incapacitated.  We need respect for the law --

6    promote respect for the law, and then Your Honor needs to

7    protect the community from predators.

8         **THE COURT:**  Mr. Goldberg, I don't know if you have

9    noticed this or appreciate it in terms of your request for a

10   top of the guidelines sentence.  There are five levels that are

11   added to the guideline calculation based on the obstruction and

12   the failure to receive acceptance of responsibility.

13        **MR. GOLDBERG:**  Yes, Your Honor.

14        **THE COURT:**  So that's 124 months, in excess of 10

15   years.  Mr. Peacock's guideline range, had he not obstructed

16   justice and had he received acceptance of responsibility in

17   connection with the plea that he entered, would have been 168

18   to 210 months.

19        **MR. GOLDBERG:**  Yes, Your Honor.  I think the man who

20   sits before you and says "I did nothing wrong" and then says to

21   Your Honor during allocution "All we did was lie together"

22   where we have text communications where, contemporaneous to the

23   event, he admits it's sex, he's not admitting responsibility

24   now.

25        **THE COURT:**  Well, I'm not going to give him acceptance

1   of responsibility.

2          **MR. GOLDBERG:**  No, I understand, I understand.  But I

3   think that the 120 months are well earned in this case.  There

4   was extra for the obstruction, absolutely.

5          **THE COURT:**  But that's to the bottom of the guideline

6   range.

7          **MR. GOLDBERG:**  Yes, Your Honor.

8          **THE COURT:**  Okay.

9          **MR. GOLDBERG:**  I don't -- I am not backing off this,

10  Your Honor.  This man traveled through interstate commerce and

11  plucked a 12-year-old girl, took her to a hotel room, committed

12  statutory rape, dropped her back off, and asked her to destroy

13  evidence.  He deserves every day he gets.

14         **THE COURT:**  Okay.  Thank you.

15         All right.  Mr. Peacock, the Government is correct, in

16  my view, in its assessment of your intellect, and that's based

17  on the psychological forensic evaluation that was done of you

18  through the Bureau of Prisons.  You're extremely bright.

19         Now, with that said, you are disturbed.  You're not

20  incompetent, but no doubt disturbed.  Anyone that would engage

21  in the conduct that you engaged in in this case and then take

22  the position that you have since that time, including the most

23  recent efforts to contact the victim after everything, you're

24  clearly, clearly disturbed.

25         The sentence that I'm going to impose, Mr. Peacock, is

1     a 328-month sentence, which is the midpoint of the guideline

2     range, and the reasons for my doing so should be very clear on

3     the record.

4          The travel through multiple states in order to engage

5     in sex with a 12-year-old, even if you thought she was 16, is

6     serious.  You noted that yourself in your own admission in the

7     text after this occurred when you said "This is a major

8     offense."

9          The fact that you preyed on her the way that you did,

10    it's disturbing to me.  You groomed her.  You victimized her.

11    The damage that she will suffer from will be lifelong.  And you

12    did this knowing that she was mentally fragile, to use your

13    term, "mentally fragile."

14         **THE DEFENDANT:**  Can I rebut?

15         **THE COURT:**  No, no, sir.  This is my time to talk.

16    It's not time for rebuttal.

17         And the fact that you knew that she was so fragile and

18    had tried to commit suicide and you had even -- I didn't

19    realize this until your statements -- that you had even seen a

20    photograph of that and then you continued to take advantage of

21    her knowing all of that, aggravating the psychological trauma

22    that this young girl is going to have to deal with for the rest

23    of her life.  And also, you acknowledge that you knew that she

24    was engaged in, at least from a chatting standpoint, similar

25    type of activity with others on the Internet.

1      So there's no question you preyed on her and you took

2  advantage of the situation.  And then now you're in here in the

3  courtroom and you're taking the position that all of this is

4  okay because you really and truly loved her.

5      **THE DEFENDANT:**  No, because I didn't do anything

6  wrong.

7      **THE COURT:**  Okay.  Well, I agree with Mr. Goldberg, I

8  mean, you didn't help yourself in your allocution.

9      **THE DEFENDANT:**  What he said was not all correct.

10  He's pulling stuff out of context.

11      **THE COURT:**  Well, the facts are very clear to me, and

12  much of the facts come straight from you in terms of the chats,

13  the ones before you engaged in sex with her --

14      **THE DEFENDANT:**  That's still disputed.

15      **THE COURT:**  It's not disputed in my mind.  And I make

16  that determination.  It's not at all disputed in my mind.

17      So, Mr. Peacock, the very real serious concern that I

18  have, in addition to my concern for this victim, is the other

19  potential victims.  Someone who stands before the Court having

20  pled guilty to offenses such as this under the facts that are

21  clear and undeniable, in my view, to take the position before

22  the Court that this is all okay and there's nothing wrong with

23  it and even finding, in your view, support for this in the

24  Bible gives me grave concern for the public were you to receive

25  a lesser sentence than this.

1    For whatever reason, whether it's because of your

2    mental disturbance or whatever the reason, you have legitimized

3    this in your own mind.  And the fact that you're doing that in

4    the face of a 30-year sentence is very troubling and very

5    difficult to understand, and it tells me that this is not

6    something that is ever going to change.  This is very

7    deep-seated.

8    And I think you're taking some pride -- I mean, you

9    kind of alluded to that even in your statement, that you're

10   taking some pride in the fact that you're standing up and I

11   guess standing up for what you believe is right even in the

12   face of admissions that we just saw Mr. Goldberg present in the

13   texts where you indicated that you knew this was a major

14   offense, at least in the eyes of Caesar, in the eyes of the

15   law.  And it is.

16   And it's not just the travel for the purpose of

17   engaging in the sexual activity, but also the attempted

18   production -- the request for the videos, the images.  That's

19   an entirely separate offense in which would subject you to

20   severe penalties even in the absence of the travel for sex.

21   So this is the sentence that I am going to impose.  I

22   believe it's the appropriate sentence.

23   I do want to note just one thing for the record.  In

24   your multiple submissions to the Court, in one of them which is

25   filed at Document 95 you reference the case of the *United*

1    *States vs. Irey* and your research in that case after also

2    reciting a 2004 Stanford Law Review article, but you cite the

3    case of the *United States vs. Irey* as a way of trying to

4    distinguish yourself from this very bad individual, Mr. Irey.

5           And you mention in your filing what he did and that it

6    was so much worse -- again, you're distinguishing yourself, and

7    there's no doubt what he did was very bad, but you reference

8    the District Court's sentence in that case being a 17 1/2 year

9    sentence and the fact that you don't understand how you could

10   be facing a higher sentence and the fact that that sentence of

11   17 1/2 years for this very bad act of Mr. Irey was upheld and

12   affirmed by --

13          **THE DEFENDANT:**  He slept with 50 children over five

14   years and videotaped it.

15          **THE COURT:**  He did.  Bad actor.  No doubt deserved

16   every day of the sentence that he received.

17          **THE DEFENDANT:**  From 6 to 14 years old.

18          **THE COURT:**  But what you didn't mention, and I don't

19   know if it's because you just didn't have access to it or

20   weren't able to find it, is that that decision was the Eleventh

21   Circuit's affirmance of the District Court's 17 1/2 year

22   sentence, which was a departure from the guideline range, was

23   taken en banc by the court and was vacated and was remanded

24   back to the District Court to impose a guideline sentence, and

25   on remand Mr. Irey received a 365-month sentence and then that

1    was affirmed on appeal.

2           **THE DEFENDANT:**  What date was that affirmed?

3           **THE COURT:**  Well, let's see, let me make sure I have

4    -- there were three different decisions.  The en banc decision

5    was rendered July 29th of 2010.  And that's where the Court of

6    Appeals sitting en banc, meaning the entire court, held that

7    the downward variance from the advisory guideline range by the

8    district judge in Mr. Irey's case was not reasonable, and it

9    was sent back with directions to impose a guideline sentence.

10          **THE DEFENDANT:**  I never knew that.  I just only had

11   what I could get my hands on.

12          **THE COURT:**  I understand.  I just don't want you to be

13   left with the impression that you're being treated differently

14   than Mr. Irey who was guilty as well of some very serious

15   sexual misconduct.

16          **THE DEFENDANT:**  I don't know if there's much

17   comparison to be made between the two.  And I'm a loyalest, I

18   stick with one person.  I shared 14 years with the other person

19   I was with.  That's how you know I wouldn't prey on someone

20   else.  I'm not a predator because --

21          **THE COURT:**  The trauma to this young lady, Mr.

22   Peacock, given how fragile she was at the time she encountered

23   you, I have little doubt that you made that a lot worse.  But

24   regardless, the conduct is what it is, and it's considered very

25   serious under our laws, and it's taken very seriously by

1    Congress, and it's taken very seriously by this Court, and that

2    will be reflected in my 328-month sentence.

3           **THE DEFENDANT:** Can I ask one question real quick?

4           **THE COURT:** Yes, sir.

5           **THE DEFENDANT:** I've heard this a lot about how I

6    caused her this great harm and victimized her and took --

7           **THE COURT:** Caused her what? I'm sorry, I didn't hear

8    you.

9           **THE DEFENDANT:** Caused her great harm and victimized

10   her and took undue advantage of her. I've got two chat logs.

11   And my question is -- one of them says, "I was going to kill

12   myself but I waited to talk to you again."

13          And then another one -- another -- I think it was a

14   month later she said -- let's see, "I was going to" -- let's

15   see, "I was going to attempt suicide again but talking to you

16   kept me from it." And I said, "I kept you from it?" And she

17   said, "Yes, you did." And she said, "I need you. I miss you.

18   I need to be sure you're okay. I almost ran after your car

19   after you left. I was going to" -- hold on. "I've never been

20   in love like this before. You hold both halves of me together.

21   They can mess with me all that they want but they will not mess

22   with you. I have to protect you no matter what."

23          And I told her "I will make sure you're okay." I told

24   her -- I put her number one, first, even above my own, you

25   know, once I basically threw myself in front of a bus to

1  save -- you know, what I thought was helping this person.

2          **THE COURT:** Right, extremely misguided protection.

3          **THE DEFENDANT:** She said, "It should be the other way

4  around, I want you to be all right."

5          **THE COURT:** Mr. --

6          **THE DEFENDANT:** I don't think that shows an injury

7  that --

8          **THE COURT:** We're going to just have to agree to

9  disagree on that, Mr. Peacock. And again, I note your several

10  references to the fact that she was mentally fragile at the

11  time you, at 32 years of age, took advantage of her.

12          **THE DEFENDANT:** How?

13          **THE COURT:** So, Mr. Peacock, I need to formally

14  pronounce your sentence. And as you know, as soon as I --

15  well, I believe as you know, because you are fairly well versed

16  in the law, as soon as I do that, I'm going to advise you of

17  your appeal rights. And so, as you know, you'll be permitted

18  to appeal from the decisions that the Court has made.

19          **THE DEFENDANT:** I just want to say one more thing,

20  that I haven't had access to the law and my rights. I haven't

21  had access to an outside psychiatrist. I haven't had access to

22  law. I haven't had my discovery until five months after the

23  hearing and a lot of the stuff I couldn't remember. And just

24  because I don't know the law or ever think the laws may say one

25  thing doesn't mean I think the law is right.

1          I delivered pizza seven years, and there was a speed

2     limit of 45 miles per hour through a government project housing

3     apartment complex, and it means by law I can't go below 30

4     miles per hour through that, and I didn't go more than 15

5     because kids would come running around cars right into the

6     middle of the street all the time.  But by law I should go at

7     least 30, and that would put them at a high danger of killing

8     one of them.  And I don't always think the law is right.  Me

9     recognizing it's a statutory rape doesn't mean I'm admitting

10    guilt, it doesn't mean that --

11          **THE COURT:**  You've already admitted guilt, Mr.

12    Peacock.

13          **THE DEFENDANT:**  It just means that -- I mean, it means

14    that I'm paranoid of the law.

15          **THE COURT:**  You've admitted guilt to both of these

16    offenses.  And your view of whether the law is right or not

17    is -- frankly, it's not relevant.

18          **THE DEFENDANT:**  And the other thing is I wouldn't

19    travel that far to have sex.  That's ridiculous.  I would only

20    do that if I really felt compelled that somebody was in serious

21    danger.  And that's what I said at the plea hearing.

22          **THE COURT:**  The only reason there was reference here

23    today about -- well, one reason there was reference here today

24    about the statements you made after the activity in North

25    Carolina that was obstruction of justice and your reference to

1   asking F.S. to delete the electronic data involving you was

2   because you sat here today and professed that you didn't do

3   anything wrong, and so it's really a credibility issue.

4   **THE DEFENDANT:** Well, just because I'm paranoid of the

5   police doesn't mean I'm admitting to doing anything wrong.

6   I've always had a paranoia of police because I know the way

7   they see things or twist things. I was paranoid of doctors,

8   too, because they almost killed my mother.

9   **THE COURT:** Right. And I accept -- Mr. Peacock, you

10  should know and the record should reflect that I accept what

11  you're saying here today that you do not think you did anything

12  wrong. And as I indicated when I was explaining my reason for

13  imposing the sentence that I'm going to impose in just a

14  moment, that concerns me greatly.

15  Mr. Peacock, I'm going to ask that you please rise.

16  *(Defendant complies.)*

17  Mr. Peacock, at this time, the Court does formally

18  adjudicate you guilty of Counts One and Two of the indictment.

19  That's consistent with your plea of guilty to the charges.

20  I do find that the Presentence Investigation Report,

21  as it's been modified here, is accurate. I order the findings

22  of the report incorporated into the following sentence:

23  Pursuant to the Sentencing Reform Act of 1984 and all

24  amendments to that law, it is the judgment of this Court that

25  the Defendant, Nicholas G. Peacock, is hereby committed to the

1    custody of the Bureau of Prisons to be imprisoned for the term

2    of 328 months as to each count, with those terms to be served

3    concurrently one with the other.

4          I do recommend that Mr. Peacock be designated to serve

5    this sentence by the Bureau of Prisons to a facility as close

6    to Saulsberry, North Carolina, as the Bureau of Prisons can

7    accommodate.

8          Am I correct, that's your request, Mr. Peacock, or do

9    you have a different request for designation?

10          **THE DEFENDANT:**  I don't know which prisons are

11   closest.  Is Lexington close?  Because I was there at my

12   competency place and I met a lot of people and, you know,

13   religious groups there and we got along really well.

14          **THE COURT:**  Would that be your request to return to

15   Lexington?

16          **THE DEFENDANT:**  I did like it there, it wasn't bad.

17          **MR. GOLDBERG:**  Your Honor, that's the Federal Medical

18   Center.

19          **THE COURT:**  I don't know if there's another facility

20   at Lexington, but you wouldn't be returned to the medical

21   center.

22          **THE DEFENDANT:**  Oh, then nevermind.  I didn't know.

23          **THE COURT:**  It is the recommendation of the Court that

24   while Mr. Peacock is in custody that he participate in sex

25   offender treatment programming, including the residential

program as well as any other similar programming that's offered
at his designated institution.

I am going to waive imposition of a fine as well as
the special assessment under the Justice for Victims of
Trafficking Act.  However, Mr. Peacock, there is a separate
special assessment that is nonwaivable, it is in the amount of
$200, which is $100 for each of the two counts of conviction,
again, a total of $200, it is due and payable immediately.

You may be seated now.

*(Defendant seated.)*

When you're released from custody, Mr. Peacock, you'll
be placed on a period of supervision for a term of life as to
each count, and those will run concurrently.  That term of
supervision is imposed based on the concerns that I've noted.

Supervision will be under the mandatory and standard
conditions adopted for supervision in this district together
with the following special conditions.  And there are a number
of them.  Some of them are required by law, Mr. Peacock, others
are required by virtue of our court's probation office
policies.

There are computer conditions.  You must not possess
or use a computer without the prior approval of your probation
officer, and that would include a cellular telephone.  You'll
be required to enroll in the probation office's computer and
Internet monitoring program and be required to abide by all

1    requirements of that program.

2            You'll be prohibited from accessing the Internet or

3    any online computer service at any location without the prior

4    approval of your probation officer.  You also will be subject

5    to periodic, unannounced examinations of any computer equipment

6    that you are allowed to possess, and that may include retrieval

7    and copying of all data from any such computers or any

8    peripheral devices in order to ensure that you are compliant

9    with this computer restriction condition.

10           It may also require removal of any equipment for the

11   purpose of conducting a more thorough inspection.  There may

12   also be the installation of hardware or software, if that is

13   directed by the probation office, in order to monitor your

14   Internet usage.  You'll be prohibited from possessing any data

15   encryption technique or program.

16           There are materials restrictions.  You'll be

17   prohibited from possessing in any form any materials depicting

18   child pornography, child erotica, or any nude or sexual

19   depictions of any child.

20           You must refrain from accessing via the Internet any

21   pornography, including adult pornography, without the prior

22   approval of your probation officer.

23           There are associational restrictions.  You must not

24   frequent or loiter within 100 feet of any location where

25   children are likely to gather or have any contact with any

1   child under the age of 18 without the approval of your
2   probation officer.

3          Your employment and your residence must be approved by
4   the probation office.  To the extent you have a change in
5   employment or residence, that likewise must be approved in
6   advance at least ten days prior to any scheduled change.

7          There are treatment conditions.  You will participate
8   in sex-offender-specific treatment as directed by the probation
9   office.  As part of the treatment program, you must submit to a
10  polygraph or other psychological or physiological testing, if
11  that is recommended by the treatment provider.  You'll also
12  undergo a mental health evaluation and participate in any and
13  all recommended treatment, including inpatient treatment, if
14  that is recommended.

15         You will be subject to periodic polygraph testing at
16  the discretion of the probation office solely as a means to
17  ensure that you are compliant with the requirements of your
18  supervision or your treatment program.

19         There are registration requirements by law.  You must
20  register with the state sex offender registry agency as
21  required by the law of the state in which you are residing or
22  in which you are released.  You must provide proof of
23  registration to the probation office within three days of your
24  release from custody.  In any state that has adopted the Sex
25  Offender Registration and Notification Act, otherwise known as

1    SORNA, you must also comply with those requirements.

2         If you have any questions whatsoever about your

3    registration requirements, I strongly suggest that you address

4    those to the Bureau of Prisons to a caseworker or case

5    management officer, to your probation officer, or to any sex

6    offender registry agency in which you reside or in which you

7    are released.

8         Regardless of how you see yourself, Mr. Peacock, the

9    law will see you now as a sex offender, and you must comply

10   with these requirements of registration and notification.  If

11   you do not, you'll be subject to a separate law violation which

12   will involve separate penalties.

13        As with all felony defendants in this court, you'll be

14   subject to a search condition, which means you'll be subject to

15   search of your person, property, home, vehicle, or computers,

16   as already noted, by a probation officer, if the probation

17   officer has reasonable suspicion to believe that you have

18   violated the terms of your supervision and also reasonable

19   suspicion to believe that the place to be searched may contain

20   evidence of that violation.

21        I have stated the basis of my decision, and I do find

22   at this time that a sentence of 328 months is sufficient but

23   not greater than necessary to comply with the purposes of

24   sentencing set forth under the law in 18 U.S.C. 3553(a), all of

25   which I have considered including the need for protecting the

1    public as well as providing general deterrence to others.

2         The total sentence is 328 months, a lifetime of

3    supervised release, and a $200 special monetary assessment.

4         Mr. Goldberg, was there a preliminary order of

5    forfeiture in this case?

6         **MR. GOLDBERG:**  No, Your Honor, there's no forfeiture

7    issue, and there's no issue of restitution.

8         What I would request of the Court, with its

9    indulgence, every time the victim's name was mentioned in this

10   court -- she is still a minor, and there's no doubt this

11   litigation is going to continue.  Could the Court direct Madam

12   Court Reporter that every time the name is mentioned in the

13   transcript it just gets changed to F.S. so we have initials

14   rather than the full name?

15        **THE COURT:**  Yes.

16        Ms. Boland, if you would please do that.

17        Also -- well, no.  She'll take care of that.  Thank

18   you.

19        All right, Mr. Lockhart, I'm going to ask you if

20   there's anything that you would like to place on the record at

21   this time on Mr. Peacock's behalf other than has already been

22   noted?

23        **MR. LOCKHART:**  Judge, just given the nature of being

24   stand-by counsel, there's a lot of things I would have noted

25   before the sentencing actually occurred.  But given the fact

1   that I am stand-by counsel, I'd have to defer to Mr. Peacock.

2   And so, frankly, to the extent that I have anything to add, I

3   don't know that it matters.  The sentence is already done.

4           **THE COURT:**  Well, you did file an objection on his

5   behalf.

6           **MR. LOCKHART:**  With his permission, I did, that

7   specific objection -- those two, rather.  I'm sorry.

8           **THE COURT:**  All right.

9           **THE DEFENDANT:**  They had to do with her acting in an

10  adult capacity and also enticing others and not me enticing her

11  or the other way around.  But I didn't want to slander her in

12  any way, so I didn't want to put her down in any capacity

13  whatsoever.

14          **THE COURT:**  Mr. Peacock, other than the objections

15  that have already been noted here and are preserved in the

16  record for appellate purposes, is there any other specific

17  objection that you wish to make to the sentence in this case

18  before I adjourn?

19          **THE DEFENDANT:**  Um, shoot.  I just had my paper.  I

20  had a few.  The selective memory, well, other than that, it's

21  photographic when it wants to remember what it wants to

22  remember.  My memory will remember certain things crystal

23  clear, but the rest is like gone.  It's just -- it's like it

24  picks what it wants to remember.

25          But the other thing is the two charges in this crime

1    basically they came from Congress's directive, their central

2    mission to end exploitation, which is the PROTECT Act, the

3    Prosecutorial Remedies and Other Tools to end the Exploitation

4    of Children Today, that's what that means.  The law is

5    deficient in the fact that it doesn't distinguish between

6    exploitation or, you know -- it doesn't -- there's no defining

7    wording of the law in how to actually determine if exploitation

8    actually occurred.

9         There's a lot of people that get married someone older

10   to someone younger, and it's not the rule, it's kind of the

11   exception, but it happens so many times that the old maxim of

12   law applies that too many exceptions, you know, nullifies the

13   rule.

14        **THE COURT:**  Mr. Peacock, I understand your objection,

15   and it's overruled.  And I will note again my finding that you

16   clearly exploited this young lady and also had her sort of

17   victimize herself, if you will, traumatize herself based on

18   your encouragement of videos and images, which I suspect adds

19   to her trauma.  But your objection is noted, it's overruled,

20   and it's preserved in the record.

21        Mr. Goldberg, is there anything from the Government

22   that you wish to place on the record as to the Court's findings

23   of fact or conclusions of law at this time?

24        **MR. GOLDBERG:**  No, Your Honor.  Thank you.

25        **THE COURT:**  Mr. Peacock, you do have the right to

1    appeal from this sentence.  Any notice of appeal that you file

2    must be filed within 14 days of the date of the Court's written

3    judgment, so not today's date.  What I've just pronounced as

4    your sentence will be put into writing, it will be filed as a

5    written judgment in our court docket most likely within the

6    next week to two weeks.  Your 14 days runs from that date, not

7    today's date.

8              **THE DEFENDANT:**  So I just give a notice to appeal?

9              **THE COURT:**  And if you can't afford the cost of an

10   appeal, you may file for leave to appeal at no cost to you.

11   Upon request, the clerk would file a notice of appeal

12   immediately on your behalf.

13             You can speak with Mr. Lockhart.  If you would like

14   the Court to consider appointing counsel to you for appellate

15   purposes, you may request that as well.

16             I would ask Mr. Lockhart if he would speak to you

17   after this sentencing hearing, if you agree, but only if you

18   agree, about your appeal rights.  But just do keep in mind that

19   14-day window is strictly enforced, and if you intend to

20   challenge the Court's decisions on appeal, you should do so

21   within that time frame.

22             **THE DEFENDANT:**  Can I ask you a question just

23   honestly?  Do you really think I did anything horrible or

24   wrong?

25             **THE COURT:**  I think my sentence reflects that.

1          Court will be in recess.

2              *(Proceedings concluded at 4:46 p.m.)*

3                    --------------------

4    *I certify that the foregoing is a correct transcript from the*
     *record of proceedings in the above-entitled matter. Any*
5    *redaction of personal data identifiers pursuant to the Judicial*
     *Conference Policy on Privacy are noted within the transcript.*
6

7                                                    *7-5-2018*
     *Donna L. Boland, RPR, FCRR*                    *Date*
8    *Official Court Reporter*

9

10

11                            INDEX

12
                                                        PAGE
13

14
                        GOVERNMENT EXHIBITS
15
     NO.:                                            RECEIVED
16
             A - H:  Photos                              50
17

18

19

20

21

22

23

24

25